McFarland, J.,
delivered tbe opinion of tbe court:
The first of these several causes was begun by a bill filed on the 20th March, 1866 (afterwards amended), byT. A. Nelson, executor of tbe will of John Trigg, deceased, against the widow and children and devisees, charging that the personal assets were insuificient for the payment of the debts, and praying a sale of land for that purpose. *735 In the progress of the cause, on the 19th of May, 1866,' Mary E. Trigg, ivho was a married woman (residing in the State of Louisiana with her husband, James B. Trigg, one of the sons and devisees of John Trigg), presented a-petition by a next friend to be made a party in the cause, claiming to be the owner of the interest of her husband, James B. Trigg, in the estate of John Trigg by a deed, which ivas exhibited with her petition. An order was entered making said Mary E. Trigg a party. Accordingly, she was made a defendant to the amended and supplemental bill, but without particular allegations as to her claims, and without sendee of process or further appearance upon her part. The cause progressed to a decree for a sale of lands for a payment of debts. A portion of the- devisees prosecuted an appeal to this court, and a writ of error was also sued out, either bv Martha L. Trigg or by Mary E. Trigg, but by wdiich of the two is controverted. The cause was heard by this court at the Apiil term, 1870, and a decree rendered reversing the chancellor for a sale of the lands, upon the grounds that the personal assets had not been exhausted, and decreeing against the claim of Mrs. Mary E. Trigg under the deed for her husband, and remanding the cause for further proceedings. The question as to wh ether the personal assets had been exhausted, turned upon the validity of a claim against the estate, in favor of the executor, which he had retained, and which this court held to have been erroneously reported in his favor. The claim was in favor of T. O. Nelson & Co., of which firm complainant was a member, and was predicated upon the guaranty of John Trigg of certain claims of the firm on O. A. Stockley. After the cause was remanded,- and much testimony taken, and several reports filed by the' master, it was again held and a decree rendered by a chancellor on the 2Sth March, 1872. This decree is adverse to the complainant in regard to pari of the claims of T. O'. Nelson & Co., and refers the cause again to the master, *736 to take and state the executor’s accounts with the estate, upon the principles settled by the decree, giving specified directions as to the claims of T. O. Nelson & Oo. to be allowed. The decree holds that the personal assets have been exhausted, with the exception of the sum the complainant had improperly retained as above indicated. The master was directed to report the value of the lands in the jurisdiction of the court, and the proportion of bona fide debts which should be charged to the lands of each de-visee. There are many other matters disposed of by this decree which need not be noticed, but there was no decree for sale of the lands. From this decree the complainant and several of the defendants prayed an. appeal, which was granted, bond given. Subsequent to this decree and before the transcript was filed in this court and appeal, to wit: on the 15th October, 1872, Mrs. Mary E. Trigg, then a widow, her husband having died in June, 1866, obtained an order in the cause for leave to file an original and cross bill against the heirs and devisees, to be consolidated with the original cause. She filed this bill accordingly, in which she .prays for dower in the lands devised by her husband by the will of John Trigg, on the 20th November, 1872. The chancellor sustained a demurrer to this bill, and Mrs. Trigg appealed, and this cause is brought up with the transcript made out under the previous appeal and the decree of March, 1872, filed in this court April 8, 1873. Notwithstanding tins decree and appeals, subsequently, on the 18th April, 1873, Mrs. Trigg having in the meantime married Gen. Gideon J. Pillow, she and her husband appealed and obtained leave to file an answer to the original bill, assuming that she had been all the time a nonresident, that she had never ap-peai*ed in the canse, and that under our statutes saving the rights of nonresidents they might yet answer, and have all the decrees set aside as to them. The answer was accord *737 ingly filed, tlie court being of opinion that she had the right to make defense.
Again, on the 27th January, 1873, as the record states, but most probably on the 7th ifay, 1873, Gen. Pillow and wife filed another cross bill against the original complainant, Nelson, as executor -and the devisees and creditors, and W. S. York and W. S. Noblin defendants. This bill gives a history of the previous proceedings and decrees, and claims that Mrs. Trigg, now Mrs. Pillow, is mot bound thereby, and again sets up her claim to all the lands devised by the will of John Trigg to her former husband, James B. Trigg, by virtue of the deed of her said husband before referred to, and insists that her claim to the lands is superior to the claim of the creditors of John Trigg’s estate. The bill charges that York & Noblin were in possession of one of the tracts of land in Tipton county, and assails their title, and insists that it is inferior to the title of complainants on various reasons given, and prays a recovery of the lands given them, with an account of the rents, etc. There are other matters in this bill that need not now be noticed. On the 17th April, 1874, a demurrer was sustained to this bill, both as to York and Noblin, as well as the other defendants, as to the claim set up by this bill to the lands of James B. Trigg, deceased, upon the ground that the question was res adjudicate by the decree of this court, and the other matters of demurrer determined in the original ease. And from this decree Gen. Pillow and wife again appealed, and a third transcript has been filed in this court. This does not complete the history of this litigation, but will suffice to present the questions first to be determined.
Without noticing the irregularity of these proceedings, we will dispose of such of the many questions SO' ably and elaborately argued as may be necessary to determine the rights of the parties, without, however, attempting to observe the order in which they are presented. And first, as *738 to tie claim of Mrs. Pillow under the deed of her deceased husband, J ames B. Trigg, to take the lands devised to him in preference to the claim of the creditors of John Trigg, the testator. The question has been argued as to whether an heir or devisee may alien the lands descended or devised before action brought against him as to give his vendee a good title against the claim of creditors of the 'ancestor. Or, do our laws create a general charge or lien on the lands of a decedent for the payment of his debts, which follows and attaches to the lands into the hands of a purchaser without regard to question of fraud. There seems to be no direct adjudication of this question in Tennessee. But in the present case the question first arises as to whether the claim of Mrs. Pillow is res adjudioata. The decree of this court on the 25th July, 1S70, in the niost direct and explicit terms adjudges that the land devised by John Trigg to J ames B. Trigg are liable in the. hands of M. E. Trigg to the debts of John Trigg equally with the lands devised to the other devisees. And that Mrs. M. E. Trigg was not a bona fide purchaser of said lands. This is beyond doubt a final adjudication of the question, provided the court then had jurisdiction of the cause as to Mrs. M. E. Trigg, for the purpose of rendering this decree. It is argued that as nothing appeal’s in the written opinion of the court, delivered by one of the judges in regard to this question, that this part of the decree was inadvertent, and rendered by mistake, and may never be corrected under our statutes. But we think it clear that the decree is not of that character. A decree so direct, full, and explicit cannot be thus set aside. The absence of a written opinion on this question is immaterial. Eor Mrs. Trigg (now Mrs. Pillow) it is argued that she had not appealed in the chancery court previous to the decree; that being a nonresident and married woman, she may not be brought before the court by publication; that the petition filed by her next friend was not such an appearance as to give the court jurisdiction of her person, *739 and aside from this, sbe did not appeal from tbe decree of tbe chancellor, and did not prosecute a writ of error, and tbat tbe appeal of the other defendants did not give the supreme court jurisdiction as to her, and the decree is therefore void.
The case of Mary N. Young v. James Young and others, decided by this court at its April term, 1874, is relied upon. In that case it appeared that Mary N. Young was the owner of a tract of land as her separate property. She joined her husband in making conveyances of lots of said land to various parties. She afterwards [filed her bill against the purchasers to set aside the conveyances and recover the lands. The chancellor gave her the relief prayed for. All the defendants prayed an appeal, which was granted upon giving bond for costs. One of the defendants only executed the bond. Upon the hearing, this court- reversed the decree of the chancellor and dismissed the bill. Subsequently, the complainant, Mrs. Young, obtained writs of possession from the chancery court against the several defendants who had not- given bond for the appeal. Upon motion the writ of possession was quashed, and Mrs. Young appealed. This court held that the case was separate and independent as to each defendant, and might appeal and leave the decree, in force as to the others, and by a proper construction of the bond executed, it was not intended to be in behalf of all of the defendants, and it did not appear that this court had -adjudicated the effect of the bond to be an appeal in behalf of all, and as the record did not show a writ of error, this court in the former instance only had adjudication of the cause as to the one defendant who had prosecuted the appeal by giving bonds; that upon these facts the jurisdiction could not be prosecuted merely because the decree in general terms had reversed the chancellor’s decree and dismissed the entire bill, and consequently the decree of the chancellor remained in force as to these defendants who did not give the bond, *740 and the decree quashing the writ of possession was reversed. From this authority it may be assumed that the appeal of a portion of the defendants did not bring the cause to this court as to Mrs. M. E. Trigg. The question then is, did she sue out a writ of error? The record of 1870 shows that in this cause an entry was made showing that it appeared to the court "that at a former term” Martha E. Trigg, by her counsel, "moved the court for a writ of error herein; that the same, as appears from a note on the judge’s docket was granted, but that the proper entry thereof was not then made. Therefore the order is now made, and to be as effectual as if the entry had been at the time the order was made.” The same entry shows that a diminution of the record was suggested in that Exhibit "A” to the petition of “Martha E. Trigg” was not copied in the record, and to supply this defect a certiorari was awarded. In response to this certiorari the clerk and master of the chancery court sent up a transcript of Exhibit “A” to the petition of Mary E. Trigg, being the deed from her husband, James B. Trigg, under which she now sets up her claim to the land. The widow of John Trigg, Martha L. Trigg, was a defendant to the cause, and this writ of error was obtained either for her or Mary E. Trigg, as there was no other parties to the cause of similar names. The entry of record grants the writ of error to Martha E., whereas the name of one was Martha JL, and the other Mary E. The entry therefore was a clerical mistake; it was not intended for the one or the other. From an examination of the record we are satisfied that the writ of error was not sued out by Martha L. Trigg. She was a party to the cause, and filed an answer and cross bill, but they were not copied into the transcript, nor did the transcript present any pleadings showing the matters of controversy between her and the executor. In making up the transcript, parts of the record were omitted by consent of counsel. Her answer to the supplemental bill appears, but it is in a few words, *741 refeiTing to her former answer and cross bill which do not appear in the transcript.
There was therefore nothing in the record presented to the supreme court upon which the question as to Martha L. Trigg could have arisen. Nor was any diminution suggested on this ground. Nor did the decree of the court determine any question as to her. And we are satisfied that the writ of error awarded was not in her behalf. On the other hand, in the same entry awarding the writ of error is the suggestion of a diminution of the record in the omission to send up a transcript of the Exhibit “A” to the petition of Martha E. Trigg. This evidently was a clerical mistake for Mary E. Trigg, for the reason that the transcript then before the court only contained the petition of Mary E. Trigg. Whatever may have been in the record of the court below, there ivas nothing in the'transcript before this court from which such a suggestion could have been made as to Martha L. Trigg. And further, the return to the certiorari shows it had reference to the petition of Mary E. Trigg. It appears therefore to our satisfaction that in the entry referred to the name of Martha E. Trigg was by mistake used for Mary E. Trigg. This is certainly so -as to suggestion of diminution and award of certiorari, and this we think leaves no doubt that the same mistake was made throughout the entire, entry, and the writ of error was in fact awarded to Mary E. Trigg. No bond or writ of error is found, but we know that in practice the actual issuance, of a unit of error or notice is often waived. And the jurisdiction of the court would not be defeated by the absence of such writ or bond. It is not indispensable that such papers should be produced, or that the record should be entirely accurate technically, in order to give the court jurisdiction. It is enough if we have satisfactory evidence from the entire record that the writ of error was awarded and the cause heard. When this appears, every intendment must be made in favor of the jurisdiction. *742 When a party lias in fact bad a bearing, and a day in court, it is not tbe policy of tbe law to defeat tbe effect of tbe judgment or decree rendered upon a clerical mistake. Tbe difference between this case and Young v. Young is that in tbe latter case there was nothing in tbe record or otherwise to show tbe court that a writ of error bad been in fact prosecuted. We may add, though not of itself conclusive, that in tbe bill of Mrs. Trigg, filed claiming dower, she admits that her claim to an absolute title to tbe land has been adjudged against her. At tbe time this writ of error was obtained, Mrs. Trigg was a feme sole, her husband then being dead. In her subsequent pleading she does not refer to tbe writ of error, or make any issue in regard to tbe authority upon which it was obtained. We bold, therefore, that tbe record shows a writ of error was prosecuted by Mary E. Trigg, and we are of opinion that tbe decree of July, 1870, is a conclusive adjudication of tbe right of tbe creditors to have satisfaction of their debts out of tbe land claimed by Mrs. Pillow under her deed. This court having jurisdiction of tbe person of Mrs. Trigg under tbe writ of error, it was then within its province to determine what questions properly arose upon tbe record before it. And as tbe decree assumes that tbe question as to tbe rights of Mrs. Trigg, under her deed, as against tbe creditors, were properly presented upon tbe record, it must be conclusive. There is therefore no error in the decree of the chancellor of tbe 17th April, 1874. Tbe bill was properly dismissed as to York & Nob! in, upon tbe further ground that tbe recovery against them in favor of the complainants was at law, and tbe bill was also manifestly multifarious. This made it unnecessary to determine the question as to the right of tbe heir to alien tbe lands, or to determine tbe other questions urged against the claim of Mrs. Pillow. Tbe decree dismissing this bill is affirmed with costs. We are of opinion that tbe chancellor’s decree sustaining tbe demurrer to tbe cross bill of Mrs. Trigg, praying for dower *743 in tbe lands devised to ber former husband by the will of John Trigg, was correct. The decree of this court of 25th July, 1870, does not adjudge the title of Mrs. Trigg under her deed to be absolutely invalid, but that it is only invalid as against the creditors of John Trigg, and that the lands in Mrs. Trigg’s hands is subject to these debts. If Mrs. Trigg became by her deed owner of the land, subject to John Trigg’s debts, she could not avoid the result by claiming dower in her own lands. But if her deed was absolutely void, and we take it that James B. Trigg, her husband, died seized and possessed of the lands, the result must be the same. It is probable we should hold that the heir is not so seized or owner of the land before the payment of the debt of the ancestor as to give his widow dower. This would certainly be so if, as argued on one side, under our laws lands descended or devised axe assets for the payment of the debts, so as to defeat the alienation of the heir or devisee. But at all events, after action brought against the heir, he cannot alien the lands, and from that date the lien or charge became fixed, and cannot be defeated by a subsequently acquired right. In this case the proceedings were commenced to reach the lands before the death of James B. Trigg, and the rights against him fixed, and 'his widow’s right to dower upon his death could not lessen the rights of the creditors. The filing of the bill, or action brought, does not merely fix a lien on the land of the heir in the nature of a lien for his own debt, but fixes upon the land the character of assets for the payment of the ancestor’s debts. The decree dismissing this bill is affirmed with costs.
We next dispose of the questions between the executor and the estate, in regard to the claim of T. 0. Nelson & Co., which comes up upon the appeal from the decree of the 11th March, 1873. This decree does not make a. final disposition of the question, but recommits the cause to the master to restate the account upon the principles settled *744 by tlie decree. Wei are tlieireforfei only toi determine whether tlie principles settled are correct. On tlie 22d July, 1858', Jolin Tries; addressed the following letter to T. 0. Nelson & Co.:
'‘Gentlemen: You are under certain liabilities for O. A. Stoekley to tlie amount of several thousand dollars, and it will be necessary for him to make further negotiations with you. I hereby bind myself to become personally responsible to you for any liabilities you are now under for him, or may hereafter become, under to the amount of •not exceeding fifteen thousand dollars. The debt to that amount will be considered as against me, 'and T am responsible to you for it.
“Very respectfully,
“JohN Tbigg.”
“P. S. — The paper which I intend to protect, will or has been indorsed by myself. The above obligation binds me for any note or bill or account now held by you against him.
“JohN Tbigg.”
Before this guaranty T. O. Nelson & Co., after the death of Trigg, transferred to his account the balance against Stoekley, of $14,580.08, which, however, had accrued in Trigg’s lifetime. The decree of this court, of 25th of July, 1870, adjudges “that the decree of the chancellor ivas erroneous in allowing the entire claim of T. O. Nelson & Co., inasmuch as C. A. .Stoeldey’s account transferred to said John Trigg, contained items for which said Trigg ivas not liable under his guaranty of 22d of July, 1858. And for the reason that said account contains other items which are not shown to belong to either’ class of the debts which Trigg undertook to pay for said Stoekley. The court'being of opinion that said Trigg, under said guaranty, became liable only for the debts of said Stoekley, to the amount of $15,000, of the specific class mentioned in *745 said guaranty, and it must be shown by the said T. 0. Nelson & Co-., t-liat the items in said Stockley’s account, which, they claim thei right to charge against- the estate of John Trigg, belonged to one or the other of the classes mentioned in said guaranty.” This is the language of the decree. So far as this decree simply determines that there is a failure of proof, and leaves the matter open for further investigation, it. is not, of course, conclusive*, but, so far as it construes the written guaranty, it is conclusive), and must be followed, if sufficiently definite. It determines that there are two classes of liabilities covered by the guaranty, bur what these two classes are, the decree does not clearly indicate. TV e are left to determine this as best we can for ourselves. We think this decree should be adhered to, so far as it does adjudge anything. As we have said, it adjudges that two classes of liabilities are covered by the guaranty. What ar*e they? First. Any liabilty of 0. A. Stockley to the firm of T. 0. Nelson & Co., at the date of the guaranty, rvhether by note, bill, or account. This is expressed unequivocally, both in the body of the letter and in the postscript. And the letter shows that such liability then existed to the amount of several thousand dollars. For the amount of such indebtedness or liability of Stockley at the time Trigg became liable by his guaranty. Second. The second class of debts and liabilities referred to* must be held to mean these contracted by Stockley after the date of the guaranty. This class is limited by Trigg to paper indorsed by himself, and it would not be necessary that it should appear that his indorsement rendered him liable as indorser. These are the two classes, as we suppose, contemplated by the former decree of this court. The decree of the chancellor of May, 1872, we think, is erroneous in denying to T. O. Nelson & Co. any claim for the balance due them from Stockley at the date of the guaranty. For such balance, if not afterwards paid by Stockley, we think Trigg’s estate is liable. Of course, the liability under the guaranty *746 cannot exceed $15,000. This being an appeal from an interlocutory decree, we can only review it so far as it settles principles. We cannot now undertake to' determine disputed questions of fact. Whether the balance due from Stockley at the date of the guaranty was subsequently paid or reduced by Stockley, may raise the question of the application of payments. We are of opinion that T. O. Nelson & Co. would have the right, if not otherwise- directed by Stockley, to apply Iris subsequent payment to debts not covered by the guaranty. But how, in fact, the payments were, applied, we do not decide. Other questions may arise, but we think this settles the question properly arising upon this paid of the decree. The chancellor’s decree, in this respect, will, therefore, be modified.
On the 9th of January, 1874, as appears from the date of the prosecution bond, Nelson, the complainant, filed another amended bill, in which he charges that he had lately been informed that W. P. York and W. S. Noblin were in possession of part of the lands devised to- James B. Trigg, lying in Tipton county, specifically referred to, claiming that James B. Trigg had, by title bond, sold these lands to a firm of Sutz, AYendle- & Co-., which bond was transferred to Steinteubel, and that York and Noblin had acquired Steint-euibel’s right under an execution, against him. The bill charges that the claim of said several parties is illegal, and was acquired during the pending of complainant’s original bill. Said parties are made defendants, the object being to subject these lands, on final hearing, with the other lands, to the payment of the debts of John Trigg, and that said defendants in possession be bound by said decree. The defendants, York and Noblin, demurred in part, and answered in part. The answer sets up seven years adverse possession as a defense, under the Act of 1819. Steinteubel made substantially the same defense by a demurrer and answer, which answer is also made- a cross bill against York and Noblin. He then obtained leave and filed *747 additional causes of demurrer and further answer. York and Noblin demurred to cross bill of Steinteuibel. The causes were then beard upon demurrer, all of which were overruled. The decree then shows that tire complainant moved the court to strike out the amended answer* setting up the defense of the statutes of limitation, upon the ground that it presented no defense to relief prayed by Nelson. The motion was sustained, and the amended answer stricken out. The cause has been argued as if the decree vas intended to strike out the answer of York and Noblin setting up the statutes of limitation, but such is not the decree. It orders the amended answer stricken out. This amended answer was filed by Steinteuibel and not by York and Noiblin. This is made clear* by the prayer-for appeal, which shows that Stednteubel, York, and Noblin all appealed, Steinteuibel appealing from the decree overruling his demurrer to Nelson’s bill, and striking out his amended answer, and York and Noblin appealing from the decree overruling their demurrer to Steinteuibel’s cross- bill. So it may-the amendments to the Steinteuibel answer that was stricken out. Without setting out the various causes assigned, we hold that the demurrer to Nelson’s amended bill was properly overruled. He was prosecuting a bill to sell the. lands devised to pay the debts, and discovered, pending the cause, that part of the lands are already held by the said parties under a title which he charges Avas not valid against the claim of creditors. We think these parties were properly brought before the court, by an amended bill, to the end that they may be bound by the decree, and the purchaser get a valid title and be put in possession, if a sale be ordered, and from the face of the bill, it does not appear that the relief Avas barred by any statute of limitation. The amended answer of S-teinteubel, Avhieh was stricken out, set up seven yearn adverse possession of the land before this amended -bill was filed against him under the Act of 1819. We think this mode of raising *748 the question is novel. But we should hold it to be error to strike out this part of the answer. So far as we see, this defense, if made out by the proof, would be effectual. In what way it might be rebutted we do not see: or decide, but wo cannot hold that upon its face it! could not be a valid defense. This action of the chancellor is, perhaps, not important, as this defense was set up in the answer of York and Nothin, the parties in possession. We hold that the chancellor erred in overruling the demurrer of York and Noblin to the cross bill of Steinteubel. We think this litigation sufficiently complicated without this cross bill, which is certainly not germane to the original subject-matter of the litigation. The demurrer tio this cross-bill will be sustained with costs. The decree overruling the demurrer to Nelson’s bill is affirmed, but modified as to' striking out Steinteubel’s answer.
Finally, on the 10th of April, 1874, Nelson filed another amended bill, charging that, owing to the accumulation of the debts, interest, taxes, and the depreciation in value of the lands, the estate had become insolvent; that he had suggested the insolvency to the county court, and filed this amended bill, to administer the estate as an insolvent estate. The devisees thereupon filed another cross bill, to which the chancellor sustained a demurrer, and the complainants in the cross bill have again appealed. The principal object of this cross bill is to hold the executor responsible for the personal assets, which it is alleged the testator left in the State of Arkansas. The will contains no devise’ or bequest of any property to the executor. There is only the general desire expressed that the debts be paid by the executor. We think that this question needs no discussion. An executor, under our law', is placed upon the footing of an administrator, and must qualify and give bond in the proper probate court before he acquires any title to the personalty or right to interfere wdth it, and when he thus gives bond and qualifies, he acquires the right to act as personal represent *749 ative as to all estate within the jurisdiction of the court, but not beyond the circuits of the state, lie thereby acquires no authority to take possession of assets from another state. If he should bring assets from another state, his securities here would not be liable therefor, as has been held as to administrators, and the same rule would apply to executors. We think there can be no doubt as to the correctness of the chancellor’s decree on this question.
There is a general allegation in the cross-bill that there are other assets on the testator’s plantations in Tipton and Shelby counties, in Tennessee, not accounted for; but there is no specific allegation or prayer of discovery, and all proper accounts of such assets could be taken without the necessity of a cross bill. The claim of Mrs. Narcissa Trigg, the widow of W. W. Trigg, who died pending these suits, for dower, cannot be allowed, for the reasons already given as to Mrs. Pillow’s claim.
The decree dismissing this cross bill is affirmed with costs. The original cause and the amended and insolvent bills will be remanded to be proceeded with. Themosts not otherwise disposed of by this opinion will be paid by the executor out of the assets of the estate.
This brings us to the case of
Thos. P. Ruby v. Mary E. Teigg et al.
This bill was filed by Euby, on the 1st of October, 1867, against Mary E. Trigg, the widow of James B. Trigg, deceased, and also against his only child, an infant daughter. The object of the bill is to foreclose a mortgage executed by James B. Trigg, on the 5th day of July, 1864, conveying to Etuby certain lands near Memphis. The deed der dares the purpose of the conveyance, as follows, to wit: “I have this day sold to Euby, 850 bales of cotton, to be delivered on the Eed river, at a point designated in an instrument this day executed by myself and wife to- said Euby, for the delivery of said cotton, for which the said *750 Ruby has paid me ten thousand dollars, and has executed me his note for $5,000, due the 1st of June, 1865, and agrees to pay t-hei balance, whatever it may be, at the stipulated price of 20 cents, at, etc.Now, if the cotton is delivered according to the contract-, or in case of failure, the money, to wit: the ten thousand dollars, and the further sum of five thousand dollars, or the'return of said note executed for the same, is returned, then this deed is void.”
Otherwise,. Ruby is authorized to file a bill and .foreclose the mortgage for the payment of said fifteen thousand dollars, or such part as may then remain unpaid. It is unnecessary to set out the contract referred to, further than to say it is for the sale by Trigg and wife, to Ruiby, of 350 bales of cotton, to be delivered near Shreveport, Louisiana, on demand, provided the demand be made within one year from the ratification of a treaty of peace between the United States and the Confederate States. Mrs. Trigg answered this bill, and set up as a defense that the contract was illegal and void, upon the ground that at the date thereof, Ruby was a citizen of Missouri, and Trigg and wife, of Louisiana, and that the contract was made during the pendency of the late civil war. She also. sets, up her claim to the land under the deed of her husband, referred to in the former case, claiming that the land wasi part of the lands devised by John Trigg to James B. Trigg. Defense was also made in behalf of the infant daughter of said James B. Trigg. The case, was heard and a decree rendered in favor of the complainant for a sale of the land. Subsequently, T. A. Nelson, executor of the will of John Trigg, came, by petition, showing the pendency of the former case; that the lands embraced in the mortgage are part of the lands devised by John Trigg to James B. Trigg’s estate, and seit up again the illegality of said contract. Upon this petition the decree Avas suspended. Nelson was made a party, the petition taken as his ansAver, and the *751 cause consolidated with, the former causé. The cause was then again heard, and a decree rendered for the complainant, from which Nelson has appealed, and it is also agreed that the cause is to b© heard as upon the appeal of Mrs. Trigg, now Mrs. Pillow, and her husband.
The question to be first met is, whether or not this contract is void for the reasons set up in the answer.
It is admitted that at tlie date of the contract Ruby was a citizen and resident of the State of Missouri. It is fully established by the proof that at the same date Trigg and wife were citizens and residents of the State of Louisiana, and had been for some years, and so remained until Trigg’s death in 1866. There is an attempt to show that Trigg liad abandoned and removed from Louisiana, and was at this time a citizen and resident of Memphis, where the contract was made. If this were so, we think it would not change the result, as a contract between a citizen of a loyal state and a citizen of Memphis, would, at the date of this contract (July, 1864), stand upon the same footing as if made between a citizen of a loyal state and a citizen of Louisiana.
But we are fully satisfied that Trigg had not changed his citizenship or residence, but was in Memphis temporarily when the contract was made. If it be true that, as argued, Trigg’s purpose in remaining in Memphis for a time was to return to his allegiance to the United States, it would not alter his status. He was still an enemy, as held in case of Mrs. Alexander’s cotton, and which prize cases. If he had removed to a loyal state, or to neutral territory, to remain during the war, the case might be different. At this date a state of war was in existence between the United States, or loyal states, including Missouri, and certain states declared to be in insurrection and rebellion, including Louisiana and Tennessee, and all commercial intercourse was forbidden without special permit. There seems to have been some doubt- as to whether or not, under *752 the first proclamation, there was not an exception in favor of places permanently held by the United States forces, like Memphis. But, certainly, there was no. such exception after 31st of March, 1863. See [Graham v. Merrill], 5 Cold., 622,
And we have held that no such exception existed previously. It is well settled that the existence of war interdicts, absolutely, all commercial intercourse between the subjects of the two. countries, and renders null and void all contracts between them during the war. The rule as stated is said to be rigid and unyielding, and subject to but one exception — that is: Contracts of necessity, as where a prisoner in the enemy’s country draws a bill of exchange for his own subsistence, etc. See Halleck’s International Law, pages 357-359.
The doctrina has been frequently recognized as applicable to the late war, both by the supreme court of the United States and by this court, and, besides, all such intercourse without special permit was expressly forbidden by the proclamation of the president of the United States, in pursuance of the acts of congress.
It is argued that this contract is not in violation of the policy of the law, because the cotton was not to be delivered until the restoration of peace. The contract was, that the cotton was to be delivered on demand, but that the demand ivas to be made within one year from the treaty of peace. It does not say that it might not be made before the restoration of peace. We do not, however, stand upon this, but may, for the argument, concede the construction contended for. We think the result is not changed. All intercourse was forbidden. No exception of the character contended for is authorized by any authority we have found. The payment of the money by Ruby to Trigg was certainly in direct violation of the policy of the rule, as by this means ten thousand dollars in money passed into the country of the Confederate States, and the entire contract *753 of which this was a part must be held illegal. Wei hold, further, that it would not change the result if it was made to appear that Ruby was ignorant of the fact of Trigg’s citizenship, or that Trigg had misled him.
This would make the contract valid as to one and void as to the other. The proof, however, does not show the facts to be as contended.
We hold that the contract is illegal, and cannot be enforced. The mortgage cannot be separated from the balance of the contract. It is a part of the same transaction. It is argued that Ruby may repudiate the contract and recover back the money or consideration paid; that he is not in pari delicto with Trigg. How this is, need not be determined. If entitled to this relief, it would be against the personal representative of James B. Trigg, who. was not made a party to the cause, although the record shows a judgment pro confesso against him. This recovery would not be under the contract', but in repudiation of it. The bill is not so framed. If entitled to this relief, it would be only a decree or judgment against the personal representatives of James B. Trigg for the money, but for this the complainant would not be entitled to the security of the mortgage.
To' give him this relief would be to enforce the contract. If the contract be repudiated, he could, at most, but have a judgment for the money. The decree must, be reversed, and the bill dismissed with costs.
Judge Sneed did not participate in the decision of these several causes, being incompetent by reason of having been of counsel.